UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JEFFREY ALLEN ROWE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-00599-SEB-MPB |
| | ) | |
| ALICIA D. COOMER Nurse, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**Order Granting in Part Defendants' Motion for Summary Judgment and
Denying Plaintiff's Partial Motion for Summary Judgment**

Plaintiff Jeffrey Allen Rowe brought this civil rights action pursuant to 42 U.S.C. § 1983 alleging claims of constitutionally inadequate medical care, and supplemental state medical malpractice, negligence, and breach of contract claims based on the treatment he received for an injured right thumb while at the New Castle Correctional Facility ("NCCF"). The claims currently pending in this action are as follows:

- Eighth Amendment deliberate indifference claims for failing to care for his right thumb injury against Nurse Alicia Coomer, Nurse Barbara Brubaker, Dr. Bruce Ippel, Nurse Melissa S. Wehrley, Nurse Megan Miller, Health Services Administrator Amber Dillow, Nurse Doug Beitler, and Nurse Jeffery Glover;

- Eighth Amendment policy, practice or custom claim against Corizon;

- Indiana state law claims of negligence against Nurse Beitler, Nurse Coomer, and Nurse Dillow for failing to timely see or schedule Rowe for a medical visit;

- Indiana state medical malpractice claims against Dr. Ippel, Nurse Brubaker, and Nurse Glover for failing to provide treatment for his right thumb injury; and

- A third party beneficiary claim that Corizon breached its contract with the Indiana Department of Correction ("IDOC").

Now before the Court are cross motions for summary judgment filed by Rowe and the defendants. Rowe seeks summary judgment in his favor as to: (1) his deliberate indifference

claims against Nurse Wehrley, Nurse Beitler, Dr. Ippel, HSA Miller, Nurse Coomer and Nurse Dillow; (2) his negligence claims against Nurse Beitler, Nurse Coomer and Nurse Dillow; and (3) his claim that Corizon breached its contract with the IDOC. *See* dkt. 77. The defendants seek summary judgment on all the claims alleged against them. Dkt. 79.

## I.     Summary Judgment Legal Standard

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp*., 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Courts often confront cross motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard. *Indiana Civil Liberties Union Found., Inc. v.*

2

*Indiana Sec'y of State*, 229 F. Supp. 3d 817, 821 (S.D. Ind. 2017) (citing *Kohl v. Ass'n. of Trial Lawyers of Am.*, 183 F.R.D. 475 (D. Md. 1998)).

Local Rule 56-1 requires that a party seeking summary judgment "include a section labeled 'Statement of Material Facts Not in Dispute' containing the facts: (1) that are potentially determinative of the motion; and (2) as to which the movant contends there is no genuine issue." *Id.* A party opposing a summary judgment motion must "include a section labeled 'Statement of Material Facts in Dispute' that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." *Id.* Due to the voluminous filings in this matter, only those material facts included in the appropriate section of the parties' brief will be considered despite any assertions that additional facts included in the argument section are incorporated into the statement of facts. *See Smith v. Corizon Med. Servs.*, No. 1:12-cv-1208-SEB-MJD, 2013 WL 2458461, at *1 (S.D. Ind. May 30, 2013) ("[d]istict courts have discretion to strictly enforce their local rules even against *pro se* litigants.") (citations omitted); *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) ("[I]t is [ ] well established that pro se litigants are not excused from compliance with procedural rules." (citation omitted)).

## II.     Material Facts

Consistent with the foregoing, the following facts were evaluated pursuant to the standards set forth above.

### A.     Facts Regarding Rowe's Medical History and Right Thumb Injury

At all times relevant to the claims in this action, Rowe was incarcerated at NCCF. Corizon was the corporate entity contracted by the IDOC to provide medical services to NCCF until March

31, 2017. All of the individual defendants in this action were employed by Corizon during the relevant time period.

On August 4, 2016, Rowe got into a fight with another inmate, and while blocking a punch with his right hand, his right thumb was injured. Dkt. 78-1 at 3. Shortly after sustaining the injury, Nurse Wehrley saw Rowe. Dkt. 80-11 at 1-3; dkt. 78-1 at 140-142. Rowe reported that he had been in an altercation with another inmate and had injured his right thumb at the knuckle. *Id*. On exam, Rowe had an active range of motion, no significant tenderness, no swelling, no bruising, and no signs of displacement. *Id*. Nurse Wehrley applied an Ace wrap to Rowe's right hand, which, according to Rowe, provided "immediate improvement in comfort." *Id*. She told Rowe to file a Request for Healthcare ("RFHC") form if the pain did not resolve itself. Nurse Wehrley testifies she provided Rowe with Tylenol pursuant to Dr. Ippel's telephone order, *id*. at 1, but Rowe disputes that he received any Tylenol during this appointment, dkt. 78-1 at 4. Nurse Wehrley did not see Rowe again.

On or about August 5, 2016, Rowe submitted RFHC # 329158, which stated:

> I saw the nurse yesterday about an injury (possible fracture) to my right thumb from a physical altercation that occured [sic] between myself and my former Bunkie. She said if my finger bruises, or changes colors, to submit a Health Care Request for a follow up. My hand/thumb is very bruised (purple) and it hurts a lot, and I can't move it! I need to be seen and given something for my pain ASAP! Thanks!

Dkt. 80-11 at 4. On the form, a notation in the middle section on the left-hand side indicated that the form was triaged on August 8, 2016, and Rowe was referred to nursing sick call. *Id*. Rowe testifies that Nurse Bill Smith told Rowe that he put Rowe's RFHC in the Nurse Sick Call Stack (that Nurse Doug Beitler "handled") on August 8, 2016. Dkt. 86 at 7-8. Defendants indicate that they are unsure who put Rowe's RFHC in the Nurse Sick Call Stack. *See* dkt. 80 at 8; dkt. 80-2, ¶ 7. Nurse Beitler did not review Rowe's RFHC form until August 29, 2016. *Id*. Nurse Beitler

wrote "Resubmitt [sic] if present," and returned the form to Rowe. Resubmit if present apparently were instructions to Rowe to resubmit a RFHC if his symptoms were still present. Rowe testifies he was not sent a copy of the response. Dkt. 78 at 5.

Rowe testifies that between August 8, 2016, and late September 2016, he submitted at least five RFHC, two letters, and a grievance to Dr. Ippel requesting to be seen and treated for his right thumb injury. Dkt. 78 at 6; dkt. 78-1 at 173. In contrast, Nurse Beitler testifies that Rowe did not send any RFHCs relating to his right thumb between August 5, 2016, and August 29, 2016, and that Rowe never resubmitted his RFHC. Dkt. 80-2, ¶ 7.

Rowe also testifies that between August 10, 2016, and late September 2016, Rowe sent Megan Miller, the NCCF Health Care Service Administrator, at least three letters informing her of his right thumb injury and asking for her help to be seen. Dkt. 78 at 6; dkt. 78-1 at 173.

On October 3, 2016, HSA Miller saw Rowe and referred him to Dr. Ippel. Dkt. 78 at 6. On October 3, 2016, Dr. Ippel saw Rowe regarding his complaints about his right thumb pain. Dkt. 80-11 at 6-9. Rowe reported that he had injured his right thumb about two months prior in an altercation and that he had been in restricted housing and unable to use ice. *Id*. Rowe reported that while in restricted housing, he had "tried to ignore it." *Id*. Rowe stated that his thumb had "mostly gotten better, but remain[ed] sore and somewhat stiff and a little swollen" and he wondered what was going on. *Id*. Dr. Ippel examined the right thumb, which was tender to palpation and Rowe had mild, decreased range of motion. *Id*. Dr. Ippel obtained an x-ray, which did not reveal a fracture, dislocation, or other abnormality. *Id*. Dr. Ippel instructed Rowe to apply heat for any discomfort. *Id*. Heat is a pain management tool for chronic pain. Dkt. 80-3, ¶ 5. Heat also helps with stiffness, which Rowe had on exam. *Id*. Dr. Ippel instructed Rowe to notify him if the heat failed to improve his condition. Dkt. 80-11 at 6. During the examination, Dr. Ippel

said Rowe definitely has a soft tissue injury and may never regain full range of motion. Dkt. 78 at 6; dkt. 78-1 at 5. Although Rowe requested pain medication, during this appointment, he did not receive even Tylenol from Dr. Ippel. Dkt. 78 at 6; dkt. 78-1 at 5.

Between about October 10, 2016, and early February 2017, Rowe submitted at least five additional RFHC and letters to Dr. Ippel to report that heat was not helping with his pain. Dkt. 78 at 6; dkt. 78-1 at 173. Dr. Ippel did not see Rowe again after the October 3, 2016, appointment. Between October 3, 2016, and the middle of February 2017, Rowe sent at least five letters to HSA Miller to inform her that heat treatment was not helping with his thumb injury and asking to be seen. Dkt. 78 at 7; dkt. 78-1 at 173. Rowe never received a response. Dkt. 78 at 7. In October 2016, in response to Rowe's grievance about his thumb injury, HSA Miller notified the grievance specialist that Rowe had been evaluated for his thumb injury on October 3, 2016, and was instructed to start the heat program. Dkt. 80-8, ¶ 7. Rowe had also been instructed to submit a RFHC form if the heat treatment was not effective. *Id.*

Between October 4, 2016, and about the middle of January 2017, Rowe submitted five RFHCs to Nurse Coomer about being seen for his right thumb injury, but she failed to take any action. Dkt. 78 at 7.

Rowe knew how to properly submit RFHCs, and had previously received prompt responses to those RFHCs. On October 1, 2016, Rowe submitted RFHC # 334123 regarding a refill for his prescription for Prilosec, a medication needed for his acid reflux. Dkt. 80-11 at 5. Nurse Coomer responded that his Prilosec had been ordered. *Id.* On October 29, 2016, Rowe submitted RFHC # 338762 again asking for a refill of his Prilosec. *Id.* at 10. Nurse Coomer responded that it had been ordered. *Id.* On November 28, 2016, Rowe submitted RFHC # 334122, again asking for a refill of his Prilosec. *Id.* at 11. One of his medical providers ordered the medication. *Id.* On

December 2, 2016, Rowe submitted RFHC # 326572, requesting to see a dentist. *Id.* at 12. The dentist saw Rowe on December 23, 2016. *Id.* On January 21, 2017, Rowe submitted RFHC # 344176 regarding his thumb pain:

> I seen Dr. Ippel back in September or October 2016 about my thumb. It is still hurting really bad. I need to see him again and I need something for the pain. I've put in several requests lately (over the last 2 months) and haven't heard back from you. Thanks!

Dkt. 80-11 at 13. That same day, nursing staff referred Rowe to Nursing Sick Call. *Id.*

On January 23, 2017, Nurse Coomer evaluated Rowe in Nursing Sick Call. *Id.*; dkt. 80-11 at 14-16. On exam, there was some swelling noted to the right thumb area and Rowe had limited range of motion in the thumb, but there was no weakness. *Id.* The area was tender to touch and Rowe complained of pain with movement. *Id.* There was no discoloration or heat noted. *Id.* Rowe also denied spasms, tingling, and numbness. *Id.* His vital signs were also normal. *Id.* Nurse Coomer instructed Rowe to apply heat for discomfort. *Id.* She also instructed Rowe to put in a RFHC for sick call if his symptoms did not subside or they became more severe. *Id.* Nurse Coomer referred Rowe to the provider for the Chronic Care Clinic and to follow-up on his complaints of thumb pain via email to the Chronic Care Clinic scheduler, Amber Dillow. *Id.*

Nurse Coomer failed to provide Tylenol for Rowe's complaints of pain. Dkt. 78 at 7. Nurse Coomer testifies she did not call the provider for same-day orders because Rowe's thumb pain was chronic in nature, and he had previously been seen for the injury by Dr. Ippel and the x-ray taken in October 2016 was normal. Dkt. 80-4, ¶ 11. If the heat therapy did not work, Rowe could have submitted another RFHC for sick call. *Id.* Additionally, Rowe could have purchased over-the-counter pain relievers from the commissary, which would be appropriate for chronic pain. *Id.*

IDOC Healthcare Services Directive 2.17 states that over-the-counter medications should be purchased by the inmate from the commissary, unless the condition is deemed a "serious health condition," a determination made by a medical professional. *Id.*, ¶ 12; *id.* at 11-45. The Directive further states that "when an offender has trouble obtaining OTCs due to indigence, the issue will not be addressed by healthcare staff." *Id.*, ¶ 12. Rather, Facility Heads shall have the authority to provide or withhold these items in much the same way that other hygiene items are managed." *Id.*

On January 24, 2017, Nurse Dillow received an email from Nurse Coomer with a list of patients that needed to be scheduled to see the provider for the Chronic Care Clinic or non-urgent medical complaints. Dkt. 80-5, ¶ 7. Nurse Coomer put Rowe on the list for Chronic Care Clinic for complaints of thumb pain. *Id.*

On February 2, 2017, Rowe submitted RFHC # 3248118, requesting more Prilosec because he was experiencing pain. Dkt. 80-11 at 17. Prilosec was ordered. *Id.* He repeated the same request with success on March 2, 2017, *id.* at 18, and March 11, 2017, *id.* at 19.

On March 2, 2017, Nurse Coomer met with Rowe for his annual wellness visit. Dkt. 80-4, ¶ 13; Dkt. 78-11 at 156-160. Rowe had no complaints and his vitals were normal. Nurse Coomer assessed Rowe's tuberculosis exposure and performed a suicide risk assessment, both were negative. *Id.* Nurse Coomer provided education on testicular self-examination. *Id.* There was no follow-up or referral required. *Id.*

On March 17, 2017, Nurse Dillow sent an email to Nurse Coomer with a list of patients who had various medical appointments scheduled for March 20, 2017. Dkt. 80-4, ¶ 14; dkt. 80-4 at 8.

Rowe was on the schedule for March 20, 2017, which was the first opportunity for a provider to evaluate him after Nurse Coomer referred him to the provider on January 24, 2017. Dkt. 80-4, ¶ 14.

Rowe was housed in a special unit called the Annex, which is physically separate from the main part of the prison. Dkt. 80-5, ¶ 6. The Annex is comprised of the M and O buildings, which are physically separate from each other and have separate offices for medical staff to evaluate and see patients. For security reasons, patients housed in the M and O buildings did not go to the main medical unit for Chronic Care Clinic appointments or provider appointments, unless there was an emergency or some other reason that would require movement to the main medical unit. *Id.* A provider (i.e., physician or nurse practitioner) would go to the Annex for Chronic Care Clinic appointments and to see patients for non-urgent medical complaints approximately twice a week. *Id.* At the time Nurse Dillow scheduled Rowe's appointment, he was housed in the O building, but he was moved to the M building just prior to the appointment and thus was not seen by a provider for chronic care on March 20, 2017. *Id.*, ¶¶ 7-8.

On March 27, 2017, Rowe submitted RFHC # 355628 and requested to know his blood type. Dkt. 80-11 at 20. Nurse Coomer responded explaining that medical does not test for blood type unless a patient needs a blood transfusion. *Id.* This is the last time Nurse Coomer had any involvement with Rowe's medical care and treatment relevant to this lawsuit. Dkt. 80-4, ¶ 15.

On April 19, 2017, Nurse Wigal evaluated Rowe in response to several RFHC forms regarding a variety of complaints, including thumb pain. Dkt. 80-11 at 21-29. Rowe reported that he had injured his thumb several months prior and had been evaluated by Dr. Ippel. *Id.* He also reported that he had been using heat with mild relief of symptoms. *Id.* Nurse Wigal referred Rowe to a provider for further evaluation. *Id.*

Nurse Dillow was not aware that Rowe had not been seen in the Chronic Care Clinic in March 2017 until Nurse Wigal referred Rowe to the provider on April 19, 2017. Dkt. 80-5, ¶ 9. Nurse Dillow scheduled Rowe to see the provider for the Chronic Care Clinic and complaints of thumb pain on May 4, 2017, which was the first available provider opening after Nurse Wigal referred Rowe to a provider. *Id*.

On May 4, 2017, Nurse Glover evaluated Rowe at the Chronic Care Clinic. Dkt. 80-7, ¶ 10; dkt. 80-11 at 30-33. Rowe was enrolled in the Chronic Care Clinic program for gastroesophageal reflux disease (GERD). Dkt. 80-7, ¶ 10. Inmates in the Chronic Care Clinic program are typically evaluated every 90 days for their chronic conditions. *Id*. Chronic Care Clinic appointments are limited and are designed to address only chronic problems and adjust medications and other treatments if necessary. *Id*. If an offender has non-chronic problems that need to be addressed, those issues will be addressed when the offender is evaluated by the provider during the provider's sick-call schedule. *Id*. However, during this appointment, Nurse Glover did evaluate Rowe for his complaints of a lump on his left testicle that he had already had for one year, but which was getting bigger and more painful. Nurse Glover also evaluated Rowe's chronic right thumb pain, and documented that the thumb pain was due to Rowe "stubbing" his thumb several months ago while playing basketball. *Id*. Rowe disputes that he stated that he hurt his thumb while playing basketball. Dkt. 91 at 4. Rowe described the pain as being in the right palmar area of the right thumb. Dkt. 80-7, ¶ 10. A review of Rowe's previous x-ray report indicated that there was no fracture. *Id*. On exam, Rowe had a lesion on his left testicle, but his genitourinary system was otherwise normal. *Id*. There was no indication of a hernia based on Nurse Glover's physical exam of the abdomen and pelvis. *Id*. Nurse Glover ordered a testicular ultrasound. *Id*. Nurse Glover also prescribed Tylenol for Rowe's thumb pain because Rowe reported that Tylenol had

provided relief of his symptoms. *Id*. Nurse Glover had no other involvement in Rowe's medical care related to his complaints of right thumb pain. *Id*.

Dr. Ippel was not aware of, and did not receive, any letters or RFHCs submitted by Rowe from August 4, 2016 through October 3, 2016. Dkt. 80-3, ¶ 9. Dr. Ippel was not aware that Rowe was not receiving any benefit from the heat program. *Id*., ¶ 10.

Nurse Brubaker was not aware of any email correspondence in January 2017 (or any other time period) between Nurse Coomer and Nurse Dillow regarding Rowe's Chronic Care Clinic appointments. Dkt. 80-6, ¶ 7. Nurse Brubaker did not review Rowe's medical records in January or February 2017. *Id*., ¶ 9.

It was Nurse Coomer's practice to document her review of RFHC forms by affixing her signature or initials to the document. Dkt. 80-4, ¶ 16. If her signature or initials are not on the document, she did not review it. *Id*. From August 5, 2016 through May 11, 2017, Rowe submitted a total of sixteen (16) RFHC forms. *Id*., ¶ 17. Only three of the sixteen complained of thumb pain. *Id*. From October 4, 2016 through January 2017, Rowe submitted four RFHC forms. *Id*., ¶ 18. Only one complained of thumb pain. *Id*. Nurse Coomer reviewed three of these forms; two regarding the Prilosec prescription and one regarding thumb pain. *Id*. Nurse Coomer is not aware of any other RFHC forms Rowe submitted during this time period. *Id*.

Nurse Brubaker and Nurse Glover had no involvement in scheduling Chronic Care Clinic appointments for patients, including Rowe. Dkt. 80-6, ¶ 8; dkt. 80-7, ¶ 8. Nurse Brubaker had no personal involvement in Rowe's medical care and treatment regarding his right thumb injury and complaints of pain. Dkt. 80-6, ¶ 5.

Nurse Wehrley did not prescribe medication for patients and did not diagnose patients or determine what medical treatment was appropriate. Dkt. 80-1, ¶ 3.

Nurse Wehrley did not—and could not—make treatment decisions for Rowe. *Id.* HSA Miller had no involvement in scheduling patients for the Chronic Care Clinic or provider appointments and she did not supervise the nurses and doctors treating Rowe. Dkt. 80-8, ¶ 6. As the HSA, patients would sometimes address RFHC forms to her; however, that did not mean that she would receive them or that she was aware that a patient had addressed a RFHC form to her. *Id.* RFHC forms are submitted to the medical department and responded to by nursing staff. *Id.* As an administrator, HSA Miller did not typically review and respond to RFHC forms. *Id.*

Douglas Beitler, Alicia Coomer, and Amber Dillow did not—and could not—make treatment decisions for Rowe. Dkt. 80-2, ¶ 5; dkt. 80-4, ¶ 5; dkt. 8-5, ¶ 5. Only a provider could do that. Nurse Beitler was not "in charge" of nurse sick call in the Annex in August 2016, or any other time. Dkt. 80-2, ¶ 3. There were other nurses who worked in the Annex. *Id.*

**B.     Expert Opinion of Dr. Kevin Krembs**

Kevin Krembs, M.D. is a licensed physician in the state of Wisconsin. *See* Dkt. 80-10. Dr. Krembs obtained his medical degree in 2002 from the National University of Ireland in Cork, Ireland. Dr. Krembs was licensed to practice medicine in the state of Indiana from 2006 to 2015. *Id.* Dr. Krembs worked as a treating physician at the Westville Correctional Facility in Indiana from 2010 to 2014. *Id.*, ¶ 4. Since 2014, Dr. Krembs has worked for the State of Wisconsin as a physician and Medical Director at the Racine Correctional Institute in Sturtevant, Wisconsin. *Id.*

Dr. Krembs was retained by the defendants to review Rowe's IDOC medical records. *Id.*, ¶ 5. Specifically, Dr. Krembs reviewed the records pertaining to the medical care and treatment provided by Nurse Melissa Wehrley, Dr. Bruce Ippel, Nurse Barbara Brubaker, Nurse Jeffrey Glover, Nurse Alicia Coomer, Nurse Amber Dillow, Nurse Douglas Beitler, and HSA Megan Miller, pertaining to Rowe's thumb injury and complaints of thumb pain. *Id.*

Based on his review of the record, Dr. Krembs concluded that HSA Miller and Nurse Brubaker had no involvement in Rowe's medical care and treatment related to his thumb injury or complaints of thumb pain. *Id*.

Further, in his medical opinion, Nurse Wehrley, Dr. Ippel, Nurse Glover, Nurse Coomer, Nurse Dillow, and Nurse Beitler's medical care and treatment of Rowe's thumb injury and complaints of thumb pain was reasonable, appropriate, and within the applicable standard of care for physicians, nurse practitioners, and nursing under the circumstances. *Id*., ¶ 6.

Additionally, in his medical opinion, Rowe did not suffer any physical harm or further damage to his thumb as a result of the medical care rendered by Nurse Wehrley, Dr. Ippel, Nurse Glover, Nurse Coomer, Nurse Dillow, and Nurse Beitler. *Id*.

Finally, in his medical opinion, Rowe's thumb injury likely consisted of a sprained flexor of the thumb. This type of injury does not require intensive physical therapy or surgery.

### C.       Facts in Dispute

The following facts are those that are in dispute, but are not necessarily material and do not necessarily create a genuine issue of fact that would preclude summary judgment.

Disputed Fact 1:  Nurse Wehrley testifies she provided Rowe with Tylenol pursuant to Dr. Ippel's telephone order, *id.* at 1, but Rowe disputes that he received any Tylenol as a result of this appointment, dkt. 78-1 at 4.

Disputed Facts 2:  Rowe testifies that between August 8, 2016, and late September 2016, he submitted at least five RFHC, two letters, and a grievance to Dr. Ippel requesting to be seen and treated for his right thumb injury.  Dkt. 78 at 6, dkt. 78-1 at 173.  Nurse Beitler testifies that Rowe did not send any RFHCs relating to his right thumb between August 5, 2016, and August 29, 2016, and that Rowe never resubmitted his RFHC.  Dkt. 80-2, ¶ 7.  Rowe also testifies that between

August 10, 2016, and late September 2016, Rowe sent HSA Miller at least three letters informing her of his right thumb injury and asking for her help to be seen.  Dkt. 78 at 6; dkt. 78-1 at 173. Rowe then testifies that between about October 10, 2016, and early February 2017, he submitted at least five additional RFHC and letters to Dr. Ippel to report that heat was not helping with his pain.  Dkt. 78 at 6; dkt. 78-1 at 173.  Rowe also testifies that between October 3, 2016, and middle of February 2017, Rowe sent at least five letters to HSA Miller to inform her that heat treatment was not helping with his thumb injury and asking to be seen.  Dkt. 78 at 7; dkt. 78-1 at 173.  He testifies he never received a response.  Dkt. 78 at 7.  Rowe additionally testifies that between October 4, 2016, and about the middle of January 2017, Rowe submitted five RFHCs to Nurse Coomer about being seen for his right thumb injury, and she failed to do so.  Dkt. 78 at 7.

Defendants assert there is no evidence that Rowe notified Dr. Ippel, or any other medical personnel at the prison, that he continued to have pain or stiffness in his thumb until his January 23, 2017, RFHC.  Dkt. 80-10 at 3.  Defendants also assert there is no evidence that any of these individuals received Rowe's correspondence or that they reviewed and read his correspondence. Dkt. 89 at 11.

Disputed Fact 3:  Rowe testifies that Nurse Bill Smith told him Nurse Smith put Rowe's RFHC in the Nurse Sick Call Stack (that Nurse Doug Beitler "handled") on August 8, 2016.  Dkt. 86 at 7-8.  Defendants indicate that they are unsure who put Rowe's RFHC in the Nurse Sick Call Stack.  *See* dkt. 80 at 8, dkt. 80-2, ¶ 7.

Disputed Fact 4:  Rowe asserts that Doug Beitler was "in charge" of Nurse Sick Call on M and O units in August 2016.  Dkt. 78 at 5.  Nurse Beitler testifies he was never "in charge" of Nurse Sick Call in the Annex.  Dkt. 80-2, ¶ 4.

Disputed Fact 5: Rowe asserts that Nurse Beitler delayed reviewing and responding to Rowe's August 5, 2016, RFHC "which was sent on August 8, 2016," and refused to see Rowe in response to that RFHC and Rowe's other RFHCs, letters and grievance. Dkt. 86 at 16. Nurse Beitler asserts he did not review RFHC form #329158 until August 29, 2016. Dkt. 80-2, ¶ 7. When Nurse Beitler reviewed RFHC form #329158, he informed Rowe he should resubmit a RFHC if he was still experiencing pain and asserts he was not refusing to see Rowe. *Id.*; *see also* dkt. 89 at 15.

Disputed Fact 6: Rowe asserts that Nurse Beitler is known to lie, to cover legal liability for others and possibly his own legal liability. Dkt. 86 at 16. In support, Rowe cites to an affidavit of Joseph Hartsock and an email. However, the evidence Rowe cites to fails to establish that Nurse Beitler has a history of lying or is known to lie to cover legal liability for others and possibly his own legal liability.

Disputed Fact 7: Rowe provides the testimony of Joseph Hartsock, who asserts that Nurse Beitler told him "prisoners should feel some pain and discomfort as part of their punishment for committing crimes." Dkt. 86 at 16-17; dkt. 86-1, ¶ 15. Nurse Beitler does not offer testimony disputing this claim, so for the purposes of the summary judgment motion only, the Court will accept this "fact" as true.

Disputed Fact 8: Rowe asserts that Amber Dillow did not schedule Mr. Rowe on the first available date after nursing staff referred him to the Chronic Care Clinic, stating that "it defies common sense and logic." Dkt. 86 at 23. Because this "fact" is not supported by admissible evidence and Nurse Dillow has provided admissible evidence regarding the scheduling of Chronic Care Clinic, the Court will not consider Rowe's assertion as fact in its consideration.

Disputed Fact 9: Rowe asserts that Joseph Hartsock, Joseph Brown, Donald Lee, and Joshua Benge have received inadequate medical treatment at NCCF. Dkt. 86 at 25-29. In support, he has included affidavits from each individual. For the purposes of this motion, the Court will accept as fact that each of Joseph Hartsock, Joseph Brown, Donald Lee, and Joshua Benge have had complaints about medical care at NCCF. A finding of constitutional inadequate medical treatment is a legal determination, however, and their personal conclusions are disregarded because they do not have any bearing on Rowe's treatment.

### III. Discussion

### A. Eighth Amendment Deliberate Indifference Claims

Rowe has asserted Eighth Amendment deliberate indifference claims for failing to care for his right thumb injury against Nurse Alicia Coomer, Nurse Barbara Brubaker, Dr. Bruce Ippel, Nurse Melissa Wehrley, HSA Administrator Megan Miller, Nurse Amber Dillow, Nurse Doug Beitler, and Nurse Jeffery Glover and a policy, practice, or custom claim against Corizon. Rowe seeks summary judgment for his Eighth Amendment claims against defendants Wehrley, Beitler, Ippell, Miller, Coomer, and Dillow, but not against defendants Brubaker, Glover or Corizon. The defendants seek summary judgment on all Eighth Amendment claims against them.

### 1. Deliberate Indifference Standard

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition

and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014). Something more than negligence or even malpractice is required. *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). A successful § 1983 plaintiff must also establish not only that a state actor violated his constitutional rights, but that the violation caused the plaintiff injury or damages. *Roe v. Elyea*, 631 F.3d 843, 846 (7th Cir. 2011) (citation omitted).

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005) (quoting *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

"A significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain." *Berry v. Peterman*,

604 F.3d 435, 441 (7th Cir. 2010). A delay in treatment that causes unnecessary pain is actionable even if it did not exacerbate the injury or diminish the chances of a full recovery. *See Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012) (holding that the plaintiff stated an Eighth Amendment claim because "even though this [four-day] delay [in treatment] did not exacerbate [the plaintiff's] injury, he experienced prolonged, unnecessary pain as a result of a readily treatable condition"); *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) ("A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain."). The failure to provide pain relief can, in some instances, establish deliberate indifference. *See McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain."). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Id.* "Even a few days' delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference." *Smith v. Knox County Jail,* 666 F.3d 1037, 1040 (7th Cir. 2012) (internal citations omitted); *compare Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816, 832 (2009) (state employees could be liable for four-day delay in treating prisoner who complained that his IV was causing him serious pain); *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (guards could be liable for delaying treatment of broken nose for a day and a half); *Edwards v. Snyder*, 478 F.3d 827, 830-31 (7th Cir. 2007) (a plaintiff who painfully dislocated his finger and was needlessly denied treatment for two days stated a deliberate-indifference claim, reversing the district court's dismissal) *with Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997) (no valid claim for six-day delay in treating a mild cyst infection).

### 2. Objectively Serious Medical Need Standard

Rowe asserts that his right thumb injury is or was a "serious" medical need. Dkt. 78 at 7-8. Defendants disagree, asserting that Rowe's injury did not require intensive physical therapy or surgery and could be adequately addressed through over-the counter medication that Rowe could purchase on his own. Dkt. 80 at 22-23.

An objectively serious medical need is "one that has been diagnosed by a physician and that requires medical treatment, or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (internal quotations and citations omitted). Moreover, when a prisoner has "a medical condition that significantly affects [his] daily activities" or has "chronic and substantial pain," the condition is objectively serious. *Ayoubi v. Dart*, No. 17-1662, 2018 U.S. App. LEXIS 7435, at *10 (7th Cir. Mar. 23, 2018) (citing *Hayes,* 546 F.3d at 522) (internal quotation omitted). A medical condition that causes pain can be serious without being life-threatening, *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011); *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (finding muscle spasms and accompanying back pain objectively serious), but "this is not to say, however, that every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim," *Gutierrez*, 111 F.3d at 1372. As the Seventh Circuit explained,

> Deliberately [] ignor[ing] a request for medical assistance has long been held to be a form of cruel and unusual punishment, but this is provided that the illness or injury for which assistance is sought is sufficiently serious or painful to make the refusal of assistance uncivilized. A prison's medical staff that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue--the sorts of ailments for which many people who are not in prison do not seek medical attention--does not by its refusal violate the Constitution. The Constitution is not a charter of protection for hypochondriacs. But the fact that a condition does not produce "objective" symptoms does not entitle the medical staff to ignore it. … Pain, fatigue, and other subjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition.

*Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996) (internal citations omitted).  Of relevance is the state of mind of the prison officials – even if an injury may later turn out to not be serious, if the injuries ***appear*** to be serious, prompt medical attention must be provided.  *Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991).   The following is a non-exhaustive list of instances where the Seventh Circuit has held that a condition was not a serious medical need under the Eighth Amendment:

- Vomiting was not a serious medical need, although the inmate's heart condition, CHF, was. *Gayton v. McCoy*, 593 F.3d 610 (7th Cir. 2010);

- A split lip and a swollen cheek did not rise to the level of an objectively serious medical need.  *Pinkston v. Madry*, 440 F.3d 879, 891 (7th Cir. 2006);

- Breathing problems, chest pains, dizziness, sinus problems, headaches, and a loss of energy as a result of exposure to second-hand smoke was not an objectively serious injury or medical need that amounts to a denial of "the minimal civilized measure of life's necessities."  *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999) (quoting *Farmer*, 511 U.S. at 834);

- A toe whose toenail had been removed did not constitute a serious medical need, although it was, no doubt, painful.  *Snipes v. DeTella*, 95 F.3d 586, 591 n.1 (7th Cir. 1996);

- A mild case of asthma (which was allegedly exacerbated by second-hand tobacco smoke) did not rise to the level of seriousness sufficient to support a claim for relief.  *Oliver v. Deen*, 77 F.3d 156 (7th Cir. 1996);

- A one-inch laceration to an arrestee's temple, that was neither deep enough or long enough to require stitches, and a scraped elbow did not require prompt medical attention under the Eighth Amendment.  *Davis v. Jones*, 936 F.2d 971, 972-73 (7th Cir. 1991); and

- Failure to treat a common cold did not constitute deliberate indifference to a serious medical need.  *Gibson v. McEvers*, 631 F.2d 95 (7th Cir. 1980).

On the other hand, the Seventh Circuit has held a variety of medical conditions as objectively serious.  *See, e.g.*, *Lewis*, 864 F.3d at 563 (muscle spasms and accompanying back pain); *Simpson v. Gorbett*, 863 F.3d 740, 747 (7th Cir. 2017) (obesity and alcoholism); *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658 (7th Cir. 2016) (cancer/lymphoma); *Chatham v. Davis*, 839 F.3d 679 (7th Cir. 2016) (fatal asthma attack); *Zaya v. Sood*, 836 F.3d 800 (7th Cir.

2016) (broken wrist); *Conley v. Birch*, 796 F.3d 742, 744-45, 747 (7th Cir. 2015) (fractured hand); *Perez v. Fenoglio*, 792 F.3d 768, 774, 776 (7th Cir. 2015) (torn ligament in hand, dislocated thumb, tissue damage, and open wound); *Pittman v. County of* Madison, 746 F.3d 766 (7th Cir. 2014) (suicide); *Smego v. Mitchell*, 723 F.3d 752 (7th Cir. 2013) (cavities in twelve teeth); *Jackson v. Pollion*, 733 F.3d 786 (7th Cir. 2013) (hypertension); *Gonzalez v. Feinerman,* 663 F.3d 311 (7th Cir. 2011) (hernia); *Arnett v. Webster*, 658 F.3d 742 (7th Cir. 2011) (rheumatoid arthritis); *Roe v. Elyea*, 631 F.3d 843 (7th Cir. 2011) (hepatitis C); *Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010) (tooth decay); *Duckworth v. Ahmad*, 532 F.3d 675 (7th Cir. 2008) (gross hematuria); *Edwards v. Snyder*, 478 F.3d 827 (7th Cir. 2007) (broken finger); *Norfleet v. Webster*, 439 F.3d 392, 394-95 (7th Cir. 2006) (arthritis); *O'Malley v. Litscher*, 465 F.3d 799, 805 (7th Cir. 2006) (minor burns resulting from lying in vomit); *Estate of Johnson v. Doughty*, 433 F.3d 1001, 1003-04 (7th Cir. 2006) (hernia); *Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005) (severe heartburn and frequent vomiting); *Sherrod v. Lingle,* 223 F.3d 605 (7th Cir. 2000) (inflamed appendix); *Chavez v. Cady*, 207 F.3d 901 (7th Cir. 2000) (perforated appendix); *Ralston v. McGovern*, 167 F.3d 1160, 1161-62 (7th Cir. 1999) (cancer that caused blistering); *Reed v. McBride*, 178 F.3d 849, 853 (7th Cir. 1999) (denial of doctor-prescribed medicine led to agonizing and extreme pain, internal bleeding, violent cramps and periods of unconsciousness); *Hudson v. McHugh*, 148 F.3d 859, 863 (7th Cir. 1998) (unmedicated epilepsy); *Collignon v. Milwaukee County,* 163 F.3d 982 (7th Cir. 1998) (mental illness that led to suicide); *Gutierrez*, 111 F.3d at 1370 (hairy cyst); *Cooper v. Casey*, 97 F.3d 914 (7th Cir. 1996) (cuts, severe muscular pain, and burning sensation in inmate's eyes and skin); *Duncan v. Duckworth*, 644 F.2d 653, 654 (7th Cir. 1981) (broken wrist). The Seventh Circuit also has recognized that delays in treating non-life-threatening but painful conditions constitute a failure to address a serious medical need. *Gutierrez*, 111 F.3d at 1371; *Edwards*, 478

F.3d at 831 (holding that a plaintiff who dislocated his finger and was forced to wait two days for treatment, leading to the infliction of unnecessary pain, permanent disfigurement and the loss of range of motion, suffered a painful medical condition and stated an Eighth Amendment claim); *O'Malley*, 465 F.3d at 805 (pain from minor burns which resulted from plaintiff lying in vomit for about two hours); *Smith v. Knox County Jail,* 666 F.3d 1037, 1040 (7th Cir. 2012) (holding that an inmate who was bleeding, vomiting, suffered retinal or corneal damage, and endured dizziness and severe pain for five days suffered from an "serious, readily treatable condition").

3.     Rowe's Right Thumb Injury

Here, Rowe injured his right thumb, an injury that was ultimately diagnosed as a "soft tissue injury." At the onset, it is debatable whether Rowe's injury was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention," but it is undisputed that Nurse Wehrley saw Rowe on the same day as his injury. When Nurse Wehrley saw Rowe, on August 4, 2016, Rowe had an active range of motion, no significant tenderness, no swelling, no bruising, and no signs of displacement – signs that his right thumb injury was not "objectively serious" – it was likely not broken or fractured. Nurse Wehrley applied an Ace wrap to Rowe's right hand, which, according to Rowe, provided "immediate improvement in comfort."

Shortly thereafter, though, Rowe submitted a RFHC stating "My hand/thumb is very bruised (purple) and it hurts a lot, and I can't move it! I need to be seen and given something for my pain ASAP!" Under these circumstances, whether or not Rowe's thumb was actually bruised and purple and unable to be moved, as described in the written request, Rowe's painful thumb injury would likely be considered to be "objectively serious." Moreover, a delay in treating his pain could constitute a failure to address a serious medical need. *Gutierrez*, 111 F.3d at 1371.

However, by October 3, 2016, when Dr. Ippel saw Rowe regarding his thumb, Rowe's thumb had "mostly gotten better, but remain[ed] sore and somewhat stiff and a little swollen." Dr. Ippel obtained an x-ray of the thumb, which revealed no fracture, dislocation, or other abnormality. Although Rowe asserts that he was experiencing some pain at this time, Rowe's pain seems more akin to "minor aches and pains …--the sorts of ailments for which many people who are not in prison do not seek medical attention" discussed in *Cooper*. 97 F.3d at 916-17. Indeed, Rowe's assertion is that he wanted Tylenol, and not some sort of stronger pain medication, to relieve his pain. "Tylenol (acetaminophen) is not anti-inflammatory…It does not help reduce swelling or inflammation. Instead, acetaminophen works by blocking your brain from releasing substances that cause the feeling of pain. It relieves minor aches and pains from: colds[,] sore throats[,] headaches and migraines[,] body or muscle aches[,] menstrual cramps[,] arthritis[,] toothaches." https://www.healthline.com/health/pain-relief/is-tylenol-anti-inflammatory#about-tylenol-and-acetaminophen. Thus, where his right thumb was verified by x-ray to not have suffered a serious injury and where his only complaint was chronic continued pain, no reasonable jury would find that Rowe's thumb was "objectively serious" at this time.

Indeed, in his future visits, nothing about Rowe's thumb condition would signify that his condition was "objectively serious." In January 23, 2017, when Nurse Coomer saw Rowe, while there was still some swelling and limited range of motion to Rowe's thumb, there was no weakness, discoloration, spasm, tingling, or numbness noted and his vitals were normal. Rowe also did not complain about his thumb during his March 2, 2017, annual wellness visit with Nurse Coomer. During his April 19, 2017, appointment with Nurse Wigal, he complained about thumb pain, but reported that heat treatment had provided mild relief of symptoms. On May 4, 2017, Nurse Glover saw Rowe about other problems, such as the lump on his left testicle and his gastroesophageal

reflux diseases, both of far more concern to the usual layperson. Rowe also complained of chronic right thumb pain, but this sort of pain does not rise to the level of "objectively serious."

Furthermore, even if we were to assume, for purposes of argument only, that Rowe has indeed established an objectively serious medical need after the October 3, 2016, appointment, Rowe still needs to demonstrate that defendants were deliberately indifferent to that need, which is explained in more detail below.

### 4. Claim against Nurse Wehrley

Rowe asserts that Nurse Wehrley was deliberately indifferent for failing to provide him with Tylenol as prescribed by Dr. Ippel on August 4, 2016. Dkt. 78 at 10. Rowe alleges that Nurse Wehrley's failure to provide Tylenol as prescribed by Dr. Ippel is *per se* deliberate indifference, citing to various Seventh Circuit cases. *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) ("intentionally interfering with the treatment once prescribed" amounts to deliberate indifference); *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999) (failure to provide prescribed pain medication for the pain of cancer and cancer treatment "borders on the barbarous"); *Murphy v. Walker*, 51 F.3d 714, 720 (7th Cir. 1995) (failure to provide prescribed Tylenol for broken hand amounts to deliberate indifference)). Nurse Wehrley asserts that she provided appropriate medical care and that she applied an Ace bandage to Rowe's right hand, which provided immediate improvement in comfort. Dkt. 80 at 26. She also asserts that she did in fact provide Tylenol. *Id.*

Dr. Krembs, defendants' expert witness, opined that Nurse Wehrley's response, examination, and use of Ace wrap, was appropriate. His opinion is consistent with guidance from the American Academy of Orthopaedic Surgeons, that states when an acute soft-tissue injury occurs, such as here with Rowe's right thumb, "initial treatment with the RICE protocol is usually very effective. RICE stands for Rest, Ice, Compression, and Elevation."

https://orthoinfo.aaos.org/en/diseases--conditions/sprains-strains-and-other-soft-tissue-injuries/.
Nurse Wehrley applied an Ace bandage (for compression) to Rowe's right hand, which provided immediate improvement in comfort, and Rowe has not disputed that Nurse Wehrley provided the Ace bandage or that it provided an improvement in comfort.  Rather, he asserts her failure to provide Tylenol as prescribed was deliberate indifference to his "serious medical need."

Although there is a dispute as to whether Nurse Wehrley actually provided Tylenol to Rowe, the Court does not find the disputed fact to be material.  Reiterating the standard for deliberate indifference, Rowe must show he suffered from an objectively serious medical condition, and Nurse Wehrley knew about his condition and the substantial risk of harm it posed, but disregarded that risk.  Construing the claims and evidence in Rowe's favor, Rowe suffered from pain from his injured right thumb, and Nurse Wehrley knew about the pain, but the evidence as presented does not show that Nurse Wehrley disregarded that risk.  Rather, Nurse Wehrley applied the Ace bandage to relieve the pain, and it did, in fact, relieve some of Rowe's pain.  She also told Rowe to file a RFHC if the pain did not resolve itself.  Unlike in *Murphy*, 51 F.3d at 720, where the correctional officers intentionally withheld extra-strength Tylenol from the inmate for his broken hand injury, Rowe has failed to show that Nurse Wehrley intentionally withheld Tylenol from him.  Moreover, the Tylenol he so adamantly wanted was not extra-strength Tylenol to be provided four times per day (as in *Murphy*), but just regular Tylenol readily available from the commissary.

Because no reasonable jury would find Nurse Wehrley to be deliberately indifferent to Rowe's "serious medical need," summary judgment on this claim for Rowe is denied and for Nurse Wehrley is granted.

5.      <u>Claim against Nurse Beitler</u>

Rowe asserts that Nurse Beitler was deliberately indifferent for improperly delaying treatment after Rowe's August 5, 2016, RFHC.  Dkt. 78 at 10-11.  Nurse Beitler asserts that he was not deliberately indifferent and his limited involvement was entirely appropriate.  Dkt. 80 at 26.

On or about August 5, 2016, Rowe submitted RFHC # 329158, which stated, relevantly, "My hand/thumb is very bruised (purple) and it hurts a lot, and I can't move it!  I need to be seen and given something for my pain ASAP!  Thanks!"  Dkt. 80-11 at 4.  On the form, a notation in the middle section on the left-hand side indicated that the form was triaged on August 8, 2016, and Rowe was referred to nursing sick call.  *Id.*  Nurse Beitler did not review Rowe's RFHC form until August 29, 2016.  *Id.*  He asserts that Rowe did not send any other RFHCs between August 5, 2016, and the date of his review.  *See* dkt. 80 at 8.  Nurse Beitler wrote "Resubmitt [sic] if present," and returned the RFHC form to Rowe.  "Resubmit if present" apparently instructed Rowe to resubmit a RFHC if his symptoms were still present.  Rowe asserts he was not sent a copy of the response.  Dkt. 78 at 5.

As explained previously, as described in the RFHC, Rowe's thumb injury at this time would likely be considered to be "objectively serious" as "even a lay person would easily recognize the necessity for a doctor's attention" if a thumb was purple and immovable.  *See Hayes*, 546 F.3d at 522.  Moreover, the medical staff, including Nurse Beitler, did not respond to Rowe's RFHC until 24 days after he submitted the request.  Such a delay in treating his pain could constitute a failure to address a serious medical need.  *Gutierrez*, 111 F.3d at 1371.

There are several material disputes of fact, specifically disputed facts 4-7 in Section II(C) above, that preclude summary judgment for both parties here.  First, although it is undisputed that

Nurse Beitler did not review Rowe's RFHC form, there is a material and unanswered question as to when Nurse Beitler was first aware of Rowe's RFHC form and should have reviewed his form. It is immaterial that Rowe did not submit additional forms between August 5 and August 29 – it is fair to say that once Rowe submitted a form requesting urgent health care, he had the expectation that he did not need to submit regular continued requests on the same issue. *See, e.g.*, *Parzyck v. Prison Health Servs. Inc.*, 627 F.3d 1215, 1219 (11th Cir. 2010) (prisoner "not required to initiate another round of the administrative grievance process on the exact same issue each time" a deprivation occurred). The defendants have not presented any evidence that IDOC policy required or encouraged the submission of duplicative requests.

Second, there is a dispute as to whether Nurse Beitler was "in charge" of the nurse sick call in the Annex in August 2016, and thus had a responsibility to review Rowe's RFHC. Third, Rowe asserts that Nurse Beitler believes that "prisoners should feel some pain and discomfort as part of their punishment for committing crimes." Dkt. 86 at 16-17. He also asserts that Nurse Beitler is known to lie, to cover legal liability for others and possibly his own legal liability. Dkt. 86 at 16.

Even assuming that Nurse Beitler was not responsible for the 24-day delay in responding to Rowe's RFHC form, there is a material dispute as to whether Nurse Beitler's response "resubmit, if present" was appropriate care. There is also a dispute as to whether Rowe was injured by the delay because he had the Ace bandage and access to Tylenol from commissary such that it is unclear what additional relief could have been provided for his soft tissue injury.

Although Dr. Krembs opined in his expert report that Nurse Beitler provided reasonable and appropriate care, dkt. 80-10 at 2, his opinion is based on an assessment that "[i]t appears Mr. Rowe was unavailable when LPN Beitler attempted to evaluate him in response to RFHC. LPN Beitler appropriately instructed Mr. Rowe to resubmit the request when he was available." *Id.* at

3.  Because the factual record on summary judgment does not reflect the factual basis of Dr. Krembs's expert opinion, the Court will not consider Dr. Krembs's expert opinion relating to Nurse Beitler for purposes of this motion.

Accordingly, summary judgment on this claim for both Rowe and Nurse Beitler is denied.

6.      Claim against Dr. Ippel

Rowe asserts that Dr. Ippel was deliberately indifferent for failing to prescribe Tylenol for his pain and for failing to respond to various communications. Dkt. 78 at 11. Dr. Ippel asserts that he provided appropriate care to Rowe. This testimony is supported by Dr. Krembs's expert opinion that Dr. Ippel provided reasonable and appropriate medical care, and Rowe did not suffer any physical harm or further damage to his thumb as a result of the medical care rendered by Dr. Ippel. In addition, Dr. Ippel states he had no reason to review RFHCs or grievances as that was not part of his job duties. Dkt. 80 at 27. In response, Rowe clarifies that his claim against Dr. Ippel "is not about Rowe's disagreement with Ippel's decision to try heat treatment, as that does not create liability," dkt. 86 at 19, but instead is about Dr. Ippel's alleged delay in not seeing Rowe until October 2016 and failing to respond after the October 2016 appointment, *id.* at 20. Dr. Ippel asserts that there is no evidence that he received Rowe's correspondence or that he reviewed and read his correspondence. Dkt. 89 at 11.

First, as explained above in Section III(A)(3), Rowe was not suffering from a serious medical condition in October 2016, which Dr. Ippel confirmed with an x-ray. Moreover, Rowe has failed to show that Dr. Ippel "knew about [Rowe]'s condition and the substantial risk of harm it posed." *Farmer*, 511 U.S. at 834 (deliberate indifference occurs when an official "knows of and disregards an excessive risk to inmate health or safety; the official must *both be aware of facts* from which the inference could be drawn that a substantial risk of serious harm exists, and *he must*

*also draw the inference*.") (emphasis added). There is no evidence that Dr. Ippel actually read Rowe's communications or had any subjective awareness of Rowe's condition. To the contrary, there is evidence that Dr. Ippel was not aware of Rowe's communications. Dkt. 80-3, ¶ 9. Accordingly, summary judgment on this issue for Rowe is denied and for Dr. Ippel is granted.

### 7.    Claim against HSA Miller

Rowe asserts that HSA Miller was deliberately indifferent for failing to respond to various communications between August and October 2016. Dkt. 78 at 11-12. HSA Miller asserts that she did not typical review or respond to requests for healthcare, and was only responsible for responding to informal grievances, which she did immediately when she was made aware on October 3, 2016, that Rowe had injured his thumb. Dkt. 80 at 30-31. HSA Miller asserts that there is no evidence that she received Rowe's correspondence or that she reviewed and read his correspondence. Dkt. 89 at 11.

The Court agrees – Rowe has failed to show that HSA Miller "knew about [Rowe]'s condition and the substantial risk of harm it posed." *Farmer*, 511 U.S. at 834. There is no evidence that HSA Miller actually read Rowe's communications or had any subjective awareness of Rowe's condition. However, Rowe correctly notes, *see* dkt. 86 at 18, that HSA Miller has not explicitly said that she did not receive or review Rowe's communications or presented any evidence that she was not aware of Rowe's communications. Rather, HSA Miller states relevantly the following:

> As the HSA, patients would sometimes address Request for Healthcare ("RFHC") forms to me; however, that did not mean that I would receive them or that I was aware that a patient had addressed a RFHC form to me. Request for Healthcare forms are submitted to the medical department and responded to by nursing staff. As an administrator, I did not typically review and respond to Request for Healthcare forms.

Dkt. 80-8 at 2. Accepting Rowe's version of facts as true, a reasonable trier of fact could possibly conclude that HSA Miller was aware of correspondence from Rowe, was aware of Rowe's

condition, and knew that the delay in arranging for Rowe to see a provider would cause additional pain to Rowe. However, a reasonable trier of fact could also conclude otherwise. Thus, there is a material dispute precluding summary judgment as to whether HSA Miller knew of Rowe's communications. Accordingly, summary judgment on this issue for both Rowe and HSA Miller is denied.

8.      Claim against Nurse Coomer

Rowe asserts that Nurse Coomer was deliberately indifferent for failing to respond to the five RFHCs he submitted to her between October 4, 2016, and the middle of January 2017. Dkt. 78 at 12. Nurse Coomer responds that she provided appropriate medical care and there is no proof that she reviewed and failed to respond to any of Rowe's RFHCs. Dkt. 80 at 27-28. In reply, Rowe newly raises the assertion that Nurse Coomer failed to provide appropriate medical care by failing to provide Tylenol and scheduling him for an appointment with a provider. Dkt. 86 at 21-22. Rowe's newly raised arguments will be considered only in response to defendants' motion for summary judgment but not as part of his motion of summary judgment. *See Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012) ("arguments raised for the first time in a reply brief are deemed waived"); *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) (same); *United States v. Foster*, 652 F.3d 776 n. 5 (7th Cir.2001) ("The reply brief is not the appropriate vehicle for presenting new arguments or legal theories to the court.").

Beginning with Rowe's assertion that Nurse Coomer failed to respond to RFHCs and thus inappropriately delayed treatment of his right thumb injury, Nurse Coomer asserts that there is no evidence that she received Rowe's correspondence from October 4, 2016, and the middle of January 2017, or that she reviewed and read those RFHCs. Dkt. 89 at 11. The Court agrees – Rowe has failed to show that Nurse Coomer "knew about [Rowe]'s condition and the substantial

risk of harm it posed" during the period between October 4, 2016, and the middle of January 2017. *Farmer*, 511 U.S. at 834. There is no evidence that Nurse Coomer actually read Rowe's alleged communications or had any subjective awareness of Rowe's condition. Accordingly, summary judgment on this issue for Rowe is denied and for Nurse Coomer is granted.

Nurse Coomer argues summary judgment in her favor is appropriate because she provided appropriate medical care. She saw Rowe on January 23, 2017, and instructed Rowe to apply heat for discomfort and to submit a RFHC if his symptoms did not subside. She also scheduled him to see a provider with the Chronic Care Clinic. Dkt. 80-11 at 14-16. This testimony is supported by Dr. Krembs's expert opinion that Nurse Coomer provided reasonable and appropriate medical care, and Rowe did not suffer any physical harm or further damage to his thumb as a result of the medical care rendered by Nurse Coomer.

Rowe asserts Nurse Coomer failed to provide Tylenol for his complaints of pain. Dkt. 78 at 7. Although Nurse Coomer does not dispute that she did not give Tylenol to Rowe, Nurse Coomer argues she did not call the provider for same-day orders because Rowe's thumb pain was chronic in nature, and he had previously been seen for the injury by Dr. Ippel and the x-ray taken in October 2016 was normal. Dkt. 80-4, ¶ 11. Additionally, Rowe could have purchased over-the-counter pain relievers from the commissary, which would be appropriate for chronic pain. *Id*. Indeed, the record reflects that Rowe procured Tylenol on his own at some point without the assistance of medical staff. Dkt. 80-11 at 30-33.

Moreover, as explained above in Section III(A)(3), Rowe was not suffering from a serious medical condition, which Dr. Ippel confirmed on October 3, 2016 with an x-ray. Nurse Coomer did not see Rowe until after the x-ray of his thumb was taken. Additionally, the Court finds that a reasonable jury would not find Nurse Coomer's failure to provide Tylenol, which was available to

and was actually procured by Rowe through other means, was deliberate indifference to Rowe's pain, where Nurse Coomer suggested that he continue heat treatment and he later indicated it provided some relief. A reasonable jury would also not find Nurse Coomer's referral of Rowe to a Chronic Care Clinic for his chronic thumb pain to be deliberate indifference. Accordingly, summary judgment for Nurse Coomer is granted.

9.     Claim against Nurse Dillow

Rowe asserts that Nurse Dillow was deliberately indifferent for failing to timely schedule Rowe for a Chronic Care Clinic visit, and not rescheduling him when he failed to make an earlier appointment. Dkt. 78 at 12. Nurse Dillow asserts that she appropriately scheduled Rowe for the next available date. She further asserts that she was unaware until April of 2017 that Rowe was transferred and thus did not make his appointment. She then timely scheduled him for the next available date. Finally, she argues Rowe was not harmed by the delay in his scheduled Chronic Care Clinic visit. Dkt. 80 at 28-29. In reply, Rowe argues that it "defies" logic that despite being referred to the Chronic Care Clinic on January 20, 2017, he was not seen until May 4, 2017. He also asserts the delay in treatment caused harm where he suffered from pain. Dkt. 86 at 23-24.

Rowe was not suffering from a serious medical condition, which Dr. Ippel confirmed on October 3, 2016, with an x-ray, and which Nurse Coomer confirmed during her January 23, 2017, examination of Rowe when she noted no discoloration, heat, spasm, tingling, or numbness in his thumb. Thus, summary judgment for Nurse Dillow is appropriate. However, even if Rowe somehow established an objectively serious medical need, he was complaining about a delay in being seen at a Chronic Care Clinic, an appointment that occurs approximately every three months for chronic pain that is being actively managed. He fails to show that Nurse Dillow "knew about [Rowe]'s condition and the substantial risk of harm it posed," *Farmer*, 511 U.S. at 834, where the

totality of her knowledge of his condition was "ccc/thumb pain." *See* Dkt. 80-5 at 8. He was eventually seen about three months after he was initially referred to the Chronic Care Clinic – he fails to show that the delay was inappropriately long, beyond arguing that it "defies" logic he was not seen sooner, or that any delay caused harm. Accordingly, summary judgment for Rowe is denied and summary judgment for Nurse Dillow is granted.

### 10. Claim against Nurse Brubaker

Nurse Brubaker asserts that summary judgment in her favor is appropriate because the undisputed evidence establishes that she had no personal involvement in Rowe's medical care, and personal involvement is required for Section 1983 liability. Rowe does not appear to dispute Nurse Brubaker's assertion as she is not mentioned in his response or surreply. *See* dkt. 86; dkt. 91.

"Individual liability under § 1983… requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.... A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.")). Because Nurse Brubaker was not personally involved in any alleged constitutional deprivation against Rowe, summary judgment against Nurse Brubaker is granted.

### 11. Claim against Nurse Glover

Nurse Glover asserts that summary judgment in his favor is appropriate because the undisputed evidence establishes that he had no personal involvement in Rowe's medical care prior to May 4, 2017, and he provided appropriate care during that visit. Rowe does not appear to

dispute Nurse Glover's assertion as he is not mentioned in Rowe's response or surreply. *See* dkt. 86, dkt. 91.

Because Nurse Brubaker was not personally involved in any alleged constitutional deprivation against Rowe, *see Colbert*, 851 F.3d at 657, summary judgment against Nurse Glover is granted.

### 12. Claim against Corizon

Corizon asserts that summary judgment in its favor is appropriate because Rowe failed to raise factual allegations to support his claim that Corizon maintained a policy, practice, or custom that caused his alleged injuries. In his Amended Complaint, Rowe alleged that Corizon had a wide-spread custom of excessively delaying medical care to patients at NCCF and this custom caused delay in his medical treatment related to his thumb injury. Dkt. 39-1 at 7.

Corizon is "treated the same as a municipality for liability purposes under § 1983." *See Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (holding that a corporation that contracted with a jail to provide health services is "treated the same as municipalities for liability purposes in a § 1983 action"); *Fromer v. Corizon, Inc.*, 54 F. Supp. 3d 1012, 1027 (S.D. Ind. 2014). "'It is well-established that there is no *respondeat superior* liability under § 1983.'" *Fromer*, 54 F. Supp. 3d at 1028 (quoting *Jackson v. Illinois Medi–Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002)) . "A 'private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." *Id.* Thus, to maintain his § 1983 action against Corizon, Rowe "must demonstrate that a constitutional deprivation occurred as a result of an express policy or custom" of Corizon. *See id.* (quotation omitted). Rowe is required to show that a Corizon policy was the "direct cause" of or "moving force" behind his constitutional injury. *Pyles v. Fahim*, 771 F.3d 403, 409-10 (7th Cir. 2014). To do so, he must introduce evidence that establishes a plausible

inference that Corizon "maintain[ed] a policy that sanction[ed] the maintenance of prison conditions that infring[ed] upon the constitutional rights of the prisoners." *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 927 (7th Cir. 2004).

"If a plaintiff cannot identify any formal policy that is unconstitutional, the plaintiff may show deliberate indifference through a 'series of bad acts' creating an inference that municipal officials were aware of and condoned the misconduct of their employees." *Fromer*, 54 F. Supp. 3d at 1028. A plaintiff cannot rely on the circumstances surrounding his own medical treatment to establish the existence of a policy or practice. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003) (holding that "a showing of isolated incidents does not create a genuine issue as to whether defendants have a general policy or a widespread practice of an unconstitutional nature"). The Seventh Circuit has not adopted "any bright-line rules defining a 'widespread custom or practice'" nor is there a "clear consensus as to how frequently such conduct must occur to impose *Monell* liability, 'except that it must be more than one instance,' [*Cosby v. Ward,*] 843 F.2d 967, 983 (7th Cir. 1988), or even three, [*Gable v. City of Chicago,* 296 F.3d 531, 538 (7th Cir. 2002)] ('[T]hree incidents where vehicle owners were erroneously told that their vehicles were not at Lot 6 do not amount to a persistent and widespread practice.')." *Thomas v. Cook Cty. Sheriff's Dep't*, 588 F.3d 445, 454 (7th Cir. 2009) (internal quotation marks omitted). Occasional delays or isolated instances of neglect, "taken alone or collectively cannot support a finding of deliberate indifference. A finding that a defendant's neglect of a prisoner's condition was an 'isolated occurrence,' ... or an 'isolated exception' ... to the defendant's overall treatment of the prisoner ordinarily militates against a finding of deliberate indifference." *Gutierrez*, 111 F.3d at 1375; *see also Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) (holding that isolated incidents of delay cannot be construed as deliberate indifference). For example, deliberate indifference can be

demonstrated by showing that a governmental entity (or corporation acting as a governmental entity) had "such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir. 1983). "And even if there are such deficiencies, a *Monell* claim can prevail only if a policy-making official knows about them and fails to correct them." *Dixon v. Cty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (citing *Wellman,* 715 F.2d at 272; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988)).

As noted, Rowe's claim against Corizon is that Corizon had a policy or practice of delaying medical treatment or providing inadequate management of pain. In support, Rowe has submitted affidavits from inmates Joseph Hartsock, Joseph Brown, Donald Lee, and Joshua Benge. *See* dkt. 86 at 24-30, dkt. 86-1. Joseph Hartsock details how, on or around May to June 2016, he was burned from hot water spilling from a mop bucket. Dkt. 86-1 at 6-9. Mr. Hartsock asserts that the medical staff delayed seeing him, and that when he was later prescribed medication, the medical staff refused to provide him with his naproxen. However, Mr. Hartsock does not appear to have submitted any RFHCs. Only informal grievances are submitted as evidence. *See id.* at 11-21.

Joseph Brown details how he had previously severed the tendons and ligaments in the middle finger of his right hand in 2014. Dkt. 86-1 at 32-34. In November 2016, he re-injured that finger, and wrote several requests for healthcare asking to be seen for his injury, but was not seen until January 2017 by Dr. Ippel. Mr. Brown was brought to see a specialist in March 2017. When he submitted several RFHCs after that visit, he was not seen until June 2017 for his painful finger injury by Nurse Glover. *Id.* at 33.

Donald Lee details how he fell and hit his head on the concrete floor in August 2015, but failed to receive sufficient health care for several months. Dkt. 86-1 at 36-38. Mr. Lee's affidavit does not, however, discuss any delay by NCCF medical staff in responding to his RFHCs.

Joshua Benge's affidavit asserts that NCCF medical staff provided inadequate treatment with respect to his Hepatitis C condition. Dkt. 86-1 at 40-42. However, his affidavit and the attachments reflect that there was little delay in the medical staff's response to his RFHCs. RFHC # 342618 was responded to within one day, *id.* at 43, RFHC # 344024 was responded to in three days, *id.* at 44, and RFHC # 294670 was responded to in three days, *id.* at 45.

Corizon argues that the provided testimony only offers "individual affiants' displeasure with individual medical staff and their healthcare in general," but fails to provide proof of an existing, unconstitutional policy, attributed to a Corizon policymaker, which violated Rowe's constitutional rights. Dkt. 89 at 16-17.

Rowe "must demonstrate that a constitutional deprivation occurred as a result of an express policy or custom" of Corizon. *Fromer*, 54 F. Supp. 3d at 1027. Although Rowe alleges Corizon was responsible for maintaining a custom of delaying medical care and providing inadequate treatment, the only constitutional deprivation that arguably occurred here was a delay in response to his RFHCs. Rowe thus must demonstrate that this delay in responding to his RFHCs was a result of a policy or custom of Corizon.

Although Rowe has provided affidavits from other inmates in order to establish that Corizon had a custom of delaying treatment at NCCF, only Mr. Brown and Mr. Benge testify as to delays in NCCF medical staff's response to their RFHCs. Mr. Brown fails to include copies of the RFHCs, but Mr. Benge has attached copies of his RFHCs, and Mr. Benge's RFHCs reflect that there were minor delays, if at all, in NCCF medical staff's response to his RFHCs. Moreover, two

affidavits regarding delay is insufficient to show that Corizon had a widespread practice that caused Rowe's alleged constitutional harm. *Thomas*, 588 F.3d at 454.

Because Rowe has failed to establish a pattern of deficiency, or that a policy-making official knew about the deficiencies and failed to correct them, summary judgment for Corizon is granted.

### B. Indiana State Law Negligence and Medical Malpractice Claims

Rowe argues that summary judgment in his favor is warranted on his claim that Nurse Beitler, Nurse Coomer, and Nurse Dillow were negligent for failing to timely see or schedule him for a medical visit. Dkt. 78 at 12-14. Defendants assert summary judgment in their favor is warranted because Rowe cannot maintain a claim against Nurse Beitler, Nurse Coomer, Nurse Dillow, Dr. Ippel, Nurse Brubaker, or Nurse Glover where defendants met the standard of care in treating his complaints and pain. Dkt. 80 at 34-35. Rowe responds by trying to dispute the expert opinion prepared by defendants' expert, Dr. Krembs, and arguing that the Court should have appointed an independent expert. Dkt. 86 at 35-36.

To show negligence under Indiana law, it is Rowe's burden to demonstrate: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by the breach. *See Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 810 (Ind. 2007); *French v. State Farm Fire & Cas. Co.*, 881 N.E.2d 1031, 1039 (Ind. Ct. App. 2008); *see also Perkins v. Lawson*, 312 F.3d 872, 876 (7th Cir. 2002). To show medical negligence under Indiana law, it is Rowe's burden to demonstrate: (1) the appropriate standard of medical care applicable to the medical provider; (2) the medical provider's care fell below that standard of care; and (3) the medical provider's failure to meet the standard of care was the proximate cause of the plaintiff's injuries. *Watson v. Medical Emergency Services*, 532 N.E.2d 1191, 1193 (Ind. App.

1989).  In a medical malpractice case, to show a breach of duty, "expert medical testimony is usually required to determine whether a physician's conduct fell below the applicable standard of care." *Bader v. Johnson*, 732 N.E.2d 1212, 1217-18 (Ind. 2000); *see also Musser v. Gentiva Health Servs.*, 356 F.3d 751, 753 (7th Cir. 2004) ("[U]nder Indiana law a *prima facie* case in medical malpractice cannot be established without expert medical testimony.").  "This is generally so because the technical and complicated nature of medical treatment makes it impossible for a trier of fact to apply the standard of care without the benefit of expert opinion on the ultimate question of breach of duty."  *Bader*, 732 N.E.2d at 1217-18.  Expert testimony is required unless the defendant's conduct is "understandable without extensive technical input" or "so obviously substandard that one need not possess medical expertise to recognize the breach."  *Gipson v. United States*, 631 F.3d 448, 451 (7th Cir. 2011).  If the patient fails to provide such evidence, then "there is no triable issue" and defendant is entitled to summary judgment as a matter of law. *Culbertson v. Mernitz*, 602 N.E.2d 98, 104 (Ind. 1992); *Kerr v. Carlos*, 582 N.E.2d 860, 863 (Ind. App. 1991).

As an initial matter, Rowe fails to provide any expert testimony in support of his claim, but blames his lack of expert testimony on the Court's failure to appoint an independent expert.  As the Court previously explained in its March 6, 2018, Order denying his motion for the Court to appoint an expert, the Court "'need not appoint an expert for a party's own benefit or to explain symptoms that can be understood by a layperson.' *Turner v. Cox*, 569 Fed. Appx. 463, 468 (7th Cir. 2014) (citations omitted)."  Dkt. 74 at 2.  Moreover, the issues in this case are not complex – certain individuals allegedly delayed responding to Rowe's RFHCs while other individuals allegedly failed to provide Rowe with Tylenol.  A lay person can understand both a soft tissue injury and the benefits of Tylenol.  Finally, as the Court previously noted, expert witness fees are

often more than $10,000 and in this case, Rowe's malpractice claims seek less than $10,000. *See* dkt. 59 at 4 n. 3; *see* dkt. 74 at 3. Rowe's failure to present expert testimony here is a consequence of his financial indigence and neither pro bono counsel nor the Court can be expected to finance his discovery costs. As seen in Rowe's briefing here and his past litigation history, Rowe is fully competent to litigate this case on his own, competently overcoming arguments of hearsay and inadmissibility. *See* dkt. 78; dkt. 86; dkt. 91; *see also Rowe v. Morton*, 525 Fed. Appx. 426, 429 (7th Cir. 2013) ("Rowe appears capable of handling civil-rights litigation on his own… His extensive litigation history … suggests that these successes were the product of experience rather than blind luck.").

Rowe has provided no evidence or argument as to medical malpractice by Nurse Brubaker or Nurse Glover. Thus, summary judgment on the state law medical malpractice claim is granted in Nurse Brubaker and Nurse Glover's favor.

As to Dr. Ippel, Rowe fails to set forth what he believes to be the standard of care and thus fails to provide any evidence of how Dr. Ippel's performance fell below the standard of care. To the contrary, Dr. Krembs testified that Dr. Ippel's medical care was appropriate. Summary judgment on the state law medical malpractice claim in Dr. Ippel's favor is also granted.

As to Nurse Beitler, Nurse Coomer, and Nurse Dillow, Rowe argues they had a duty to provide timely and adequate health care. Indiana law recognizes that a custodian has a legal duty to exercise reasonable care to preserve the life, health and safety of a person in custody. *See Sauders v. County of Steuben*, 693 N.E.2d 16, 18 (Ind. 1998). Rowe asserts that the duty was breached by their failure to timely schedule him for an appointment or see him. He asserts he was injured when he suffered from prolonged pain. For the same reasons explained above in Section III(A)(5), there are material disputes of fact as to Nurse Beitler that preclude summary judgment

on the negligence claim. However, as to Nurse Coomer and Nurse Dillow, for the same reasons discussed in Section III(A)(8)-(9) above, Rowe fails to show that Nurses Coomer and Dillow knew of his condition as to have improperly delayed treatment. Thus, Rowe fails to show they breached their duty. Accordingly, summary judgment on the negligence claim for Rowe is denied, for Nurse Beitler is denied, and for Nurses Coomer and Dillow is granted.

C.      Corizon's Breach of Contract

Finally, both Rowe and Corizon seek summary judgment on the breach of contract claim. Rowe alleges that Corizon breached its contract with the IDOC because Corizon was aware that inmates at NCCF had filed grievances and lawsuits related to alleged delays in medical treatment and inadequate management of complaints of pain and failed to take reasonable measures to correct these deficiencies. Specifically, Rowe identifies various IDOC Healthcare Services Directives ("HCSD") he alleges Corizon employees failed to comply with in his case, and argues this is breach of contract. Defendants argue that (1) Rowe was provided reasonable and appropriate medical care and treatment, and (2) Rowe fails to establish he is a third-party beneficiary to the contract. In response, Rowe has asserted he is a third-party beneficiary.

Neither party has provided the Court with a substantive discussion regarding the contract claim. The entirety of Rowe's argument is that Corizon failed to adhere to certain HCSD and a statement that he is a third party beneficiary. The defendants' simplistic response is that they did not breach any contract and Rowe is not a third party beneficiary. The unfortunate result is that the Court has not been able to rely on the parties' briefing. Instead, the Court's ruling is based on a reading of the contract itself, which was attached to Rowe's motion for summary judgment, and independent research.

It is well-settled law that "[t]he parties to a contract are the ones to complain of a breach, and if they are satisfied with the disposition which has been made of it and of all claims under it, a third party has no right to insist that it has been broken." *Harold McComb & Son, Inc. v. JPMorgan Chase Bank, NA*, 892 N.E.2d 1255, 1258 (Ind. Ct. App. 2008) (internal quotation omitted). In Indiana, "only the parties to a contract, those in privity with the parties, and intended third-party beneficiaries under the contract may seek to enforce the contract." *Id.* (citing *Gonzales v. Kil Nam Chun*, 465 N.E.2d 727, 729 (Ind. Ct. App. 1984)).

Rowe is not a party to the contract nor in privity with any of the parties, but he contends that he is the intended third-party beneficiary under the contract. The Indiana Supreme Court has explained the circumstances under which a third party to a contract may sue to enforce the contract:

> To be enforceable, it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. It is not enough that performance of the contract would be of benefit to the third party. It must appear that it was the intention of one of the parties to require performance of some part of it in favor of such third party and for his benefit, and that the other party to the agreement intended to assume the obligation thus imposed. The intent of the contracting parties to bestow rights upon a third party must affirmatively appear from the language of the instrument when properly interpreted and construed.

*Cain v. Griffin*, 849 N.E.2d 507, 514 (Ind. 2006) (internal quotation omitted). A third party beneficiary must show the following:

> (1) A clear intent by the actual parties to the contract to benefit the third party;
> (2) A duty imposed on one of the contracting parties in favor of the third party; and
> (3) Performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract.

*Eckman v. Green*, 869 N.E.2d 493, 496 (Ind. Ct. App. 2007) (citing *Luhnow v. Horn*, 760 N.E.2d 621, 628 (Ind. Ct. App. 2001)). "The intent to benefit the third party is the controlling factor and may be shown by specifically naming the third party or by other evidence." *Id.*

A copy of the contract between Corizon and IDOC is attached as an exhibit to Rowe's motion for summary judgment. *See* Dkt. 78-1 at 106-133. While there is no dispute that the performance of the contract was to be of benefit to the inmates of IDOC, the intent of the contracting parties to bestow rights upon Rowe does not affirmatively appear from the language of the instrument. *See Cain*, 849 N.E.2d at 514. In Illinois, the contract with the Illinois DOC specifically contains a clause expressly disclaiming the existence of any third party beneficiaries. *See Flournoy v. Ghosh*, No. 07 C 5297, 2010 U.S. Dist. LEXIS 41774, at *5 (N.D. Ill. Apr. 27, 2010); *Johnson v. Shah*, No. 15-cv-344-SMY-RJD, 2018 U.S. Dist. LEXIS 19277, at *25 (S.D. Ill. Feb. 6, 2018). While the same clause is not found in Corizon's Indiana IDOC contract, the only mention in the contract of inmates is in the first line of the agreement that "[t]he Contractor [Corizon] shall provide comprehensive medical services, including dental, medical, mental health and substance abuse, to offenders at IDOC correctional facilities." Dkt. 78-1 at 108. This is not an affirmative statement of any intent to bestow rights upon the inmates at IDOC. Nor is there an affirmative statement in any part of the contract to show an intent to bestow rights on the inmates. In *Ellis v. CCA of Tenn., LLC*, No. 1:08-cv-254-SEB-DML, 2010 U.S. Dist. LEXIS 61837, at *25-27 (S.D. Ind. June 21, 2010), certain nurses asserted that they were third-party beneficiaries of a contract between CCA, who was hired to manage the medical needs of inmates in Marion County jails, and the Marion County Sheriff. The Court held that "nothing in the contract specifically indicates that the nurses who were employed by CCA at the Jail were intended to be third party beneficiaries," and therefore summary judgment in favor of CCA was warranted. *Id.* Similarly, because there was no intent by Corizon or IDOC to specifically benefit and confer rights upon the inmates at IDOC's correctional facilities in their contract, Rowe has no legal standing to complain because he is not a third-party beneficiary to the contract.

Even if Rowe was a third-party beneficiary to the contract and was correct that Corizon breached its contract with the IDOC, Rowe has failed to demonstrate any damages from the alleged breach. *See WESCO Distribution, Inc. v. ArcelorMittal Ind. Harbor LLC*, 23 N.E.3d 682, 695 (Ind. Ct. App. 2014) ("The elements of a breach of contract claim are the existence of a contract, the defendant's breach, and damages to the plaintiff.").

Accordingly, Rowe's motion for summary judgment on this claim is denied, and Corizon's motion for summary judgment on this claim is granted.

## IV.    Conclusion

It has been explained that "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford-El v. Britton,* 118 S. Ct. 1584, 1598 (1998). This is a vital role in the management of court dockets, in the delivery of justice to individual litigants, and in meeting society's expectations that a system of justice operate effectively. Indeed, "it is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained," and in such cases, summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir. 1983).

Rowe's motion for partial summary judgment, dkt. [77], is **denied**. Defendants' motion for summary judgment, dkt. [79], is **granted in part and denied in part**, as follows:

- Nurse Wehrley, Dr. Ippel, Nurse Coomer, Nurse Dillow, Nurse Brubaker, Nurse Glover, and Corizon are entitled to judgment as a matter of law on the Eighth Amendment claims;

- Nurse Beitler and HSA Miller are **not** entitled to judgment as a matter of law on the Eighth Amendment claims;

- Nurse Beitler is **not** entitled to judgment as a matter of law on the Indiana state law negligence claim;

- Nurse Coomer and Nurse Dillow are entitled to judgment as a matter of law on the Indiana state law negligence claims;

- Nurse Brubaker, Nurse Glover, and Dr. Ippel are entitled to judgment as a matter of law on the Indiana state law medical malpractice claims; and

- Corizon is entitled to judgment as a matter of law on the breach of contract claim.

The claims remaining for resolution are the Eighth Amendment deliberate indifference claims against Nurse Beitler and HSA Miller and the negligence claim against Nurse Beitler.

Because this action will be resolved by settlement or trial, the Magistrate Judge is requested to set this matter for a telephonic status conference to discuss what further development is necessary for trial and if the case is amenable to settlement.

The clerk is **directed to terminate on the docket** defendants Nurse Wehrley, Dr. Ippel, Nurse Coomer, Nurse Dillow, Nurse Brubaker, Nurse Glover, and Corizon.

No partial final judgment shall issue.

**IT IS SO ORDERED.**

Date:    7/10/2018

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

JEFFREY ALLEN ROWE
116017
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

Electronically Registered Counsel